COMMONWEALTH *VS.* ANTONIO DOSANJOS.

No. 99-P-213.

Suffolk. October 13, 2000. - September 18, 2001.

Present: PERRETTA, GILLERMAN, & PORADA, JJ.

*Practice, Criminal,* Jury and jurors, Voir dire. *Jury and Jurors.*

At a criminal trial, there was no abuse of discretion or other error of law in the judge's determination, after jury deliberations had begun, that a juror should be discharged, where the judge determined, after repeated questioning in the presence of defense counsel and the prosecutor, and with the agreement of defense counsel, that the juror was unable to be fair and impartial. [534-535]

Although it was error for the judge at a criminal trial to exclude the defendant from the individual voir dire examination of the deliberating jurors concerning the discharge of one of their members, this court concluded that the error was harmless beyond a reasonable doubt and the defendant was not entitled to reversal of his convictions, where, during the voir dire examination, the judge made patient and careful inquiry of each juror about topics agreed upon by her, the prosecutor and defense counsel, and all responses indicated the discharged juror's difficulty would have no impact upon the remaining jurors' ability to continue deliberating in a fair and impartial manner. [535-537]

INDICTMENTS found and returned in the Superior Court Department on November 8, 1996.

The cases were tried before *Margot Botsford,* J.

*Brian J. Kelly* for the defendant.

*Kajal Chattopadhyay,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. After a jury trial in the Superior Court, the defendant was found guilty on indictments charging him with rape of a child, kidnaping, and assault and battery. On appeal he argues that the judge erred in excluding him from the individual voir dire examination of the deliberating jurors concerning the discharge of one of their members. Although we agree that it

was error to exclude the defendant from the voir dire, we conclude that the error was harmless beyond a reasonable doubt and affirm the convictions.

1. *Background.* There was evidence to show that at about 6:45 A.M., June 5, 1996, the defendant offered the fourteen year old victim, the niece of his close friends, a ride to school. She accepted. Once in the defendant's car, he locked the doors, drove to a building in the Dorchester section of Boston, and brought the victim to a third-floor apartment where he raped her. The apartment belonged to one of the defendant's friends. The defendant warned the victim not to tell anyone or he would hurt her family. He then drove her to school. There was also evidence to show that the victim was late for school that day, arriving sometime after 7:55 A.M.

The defendant claimed that the victim had fabricated the charges against him and that he arrived at work that day at 7:56 A.M., as verified by his time card. The defendant's mother-in-law testified that she could not remember a day that the defendant left for work earlier than 7:15 A.M. Numerous coworkers of the defendant testified about time cards. Each denied punching in the defendant's time card for him, and each stated that to have done so would have been grounds for dismissal from their employment.

2. *The discharge of the juror.* Deliberations commenced on April 15, 1998, at 1:40 P.M. On the morning of April 17, a court officer informed the judge that one of the jurors, whom we shall refer to as juror-1, wished to speak with her. The judge immediately convened a lobby conference with the prosecutor, defense counsel, and the juror.[1]

Juror-1 informed the judge that, during the trial, she became aware of the fact that she recognized the defendant and some of his witnesses as members of the cleaning crew at the large office building in Boston in which she worked and that, although she and they were frequently together on a freight elevator, she did not know any of them personally. She stated that she spoke to a court officer about the matter and that he had advised her that he would relate the information to the judge. The court of-

---

[1]The defendant makes no complaint about his absence from this stage of the inquiry.

ficer never got back to her, the presentation of evidence continued, and then deliberations began.

Deliberations were exceedingly stressful for the juror. She explained that as discussion progressed, she "couldn't seem to get with all the other jurors when they were deliberating," she was "seeing something a different way," she "couldn't grasp it," she couldn't "get ahold" of herself. Juror-1 described how she was unable to sleep or eat and was "smoking cigarettes like they're going out of style." Of significance, the juror told the judge: "I can't do this, I just can't do this any more. I have got to go back to work. I have to see all these people all over again. I just can't do it. . . . It's like — I don't want to say family, you see somebody on a constant basis all the time, it's sort of different than just seeing somebody one time and just saying, oh, he looks familiar."

In response to questions from the judge, juror-1 stated that the first time she told the other jurors that the defendant and some of the witnesses were familiar to her was that very morning. At no time during her service as a juror did she convey to the other jurors any information based upon her knowledge of the building or her recognition of the defendant and witnesses. When asked if her recognition of the defendant and witnesses had affected her ability to be a fair and impartial juror, juror-1 stated that it had, that she was unable to put it from her mind, and that "it's here, it's with me constantly." She characterized her participation in the deliberations as a "nightmare" and repeated that she could not continue. Concluding that juror-1 could not be fair and impartial, the judge excused her from further service.

When defense counsel expressed concern that juror-1 might have "brought some extraneous information . . . into the jury deliberations," the judge agreed, without objection by the prosecutor, to question each juror individually about what juror-1 had said to them that morning, whether she had provided any information about the building or the working procedures of the cleaning crew, and whether anything she said would affect their ability to be fair and impartial. It is at this point, the individual questioning of the jurors, that defense counsel asked that the defendant be present. The trial judge denied the request

on the basis that, because deliberations were ongoing, the defendant's presence would be inappropriate.

One by one, the deliberating jurors were brought to the judge's lobby where she made patient and careful inquiry of each about the three topics agreed upon by her, the prosecutor, and defense counsel. All their individual responses were essentially the same: juror-1 had said nothing about her difficulty and the reason for it until that morning, that when she finally spoke up, she said only that she worked in the same building as did the defendant and some of the witnesses, that other than to greet them with a social hello, she did not know them, that the entire situation put an inordinate amount of stress upon her, and that she was of the view that she could no longer deliberate in a fair and impartial manner. Further, each of the questioned jurors stated that the fact that juror-1 was visibly upset and had told them that she could no longer deliberate would have no impact upon his or her ability to continue deliberating in a fair and impartial manner.[2]

At the conclusion of the individual examinations, defense counsel complained that, in his opinion, two of the questioned jurors had mentioned that juror-1 behaved as if she had "something to fear" from further deliberations. He argued that juror-1 had imparted to the jurors an impression that they had something to fear should they find the defendant guilty. The judge did not agree with defense counsel's assessment of the situation, denied his motion for a mistrial, and found and concluded that the remaining jurors were able to begin their deliberations anew with an alternate juror. She then addressed the newly constituted jury and instructed them that she had "excused the deliberating juror" and that they "must begin again as though nothing had occurred because this group as now constituted is the deliberating jury and it is important to start over again and proceed on your way." She made no mention of the reason for the discharge of juror-1 other than to state that "[s]he was not able to continue to deliberate."

3. *Discussion.* Notwithstanding the defendant's argument to

---

[2]At various times during the individual questioning, defense counsel asked the judge to inquire about issues that he wanted further explored. She complied with all the requests.

the contrary, we see no abuse of discretion or other error of law in the judge's determination that juror-1 should be discharged. Although defense counsel stated that "it does sound to me like she has stated that she cannot be a fair and impartial juror . . . ," he nonetheless asked that it be made clear on the record. In an abundance of caution, the judge again asked juror-1 whether she could put aside her recognition of the various witnesses and be fair and impartial. Again, juror-1 stated that she "truly" could not. Compare *Commonwealth* v. *Young*, 401 Mass. 390, 405-406 (1987) (affirming trial judge's discretionary decision to refuse to discharge juror where she disbelieved juror and found that he wanted only to be relieved of his obligation to serve).

It was, however, serious error for the judge to refuse to allow the defendant to be present during her questioning of the jurors. "When a judge conducts an inquiry about a consequential matter, such as occurred in this case with the troubled juror, there is a requirement, deriving from the constitutional rights of confrontation and fair trial, that the defendant and his counsel be present." *Commonwealth* v. *Martino*, 412 Mass. 267, 286 (1992). We consider the defendant's exclusion from the voir dire in relation to the entire record to determine whether the error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Owens*, 414 Mass. 595, 606 (1993).

The judge tailored her questions to each juror in accordance with defense counsel's requests, not one of which was denied. The exhaustive questioning of juror-1 and the other jurors shows that juror-1 knew nothing about the time-keeping procedures of the defendant's employer and that, immediately before speaking to the judge, she made only one statement to the other jurors: she recognized, but did not know, the defendant and some of his witnesses as people who worked in the same building as she and this recognition was causing her a great deal of stress.

Each of the jurors was asked about what juror-1 had said to them, and all the responses were consistent with each other as well as with those given by juror-1. Each related that juror-1 had remained silent and had not participated in the deliberations. Each described juror-1 in terms of being "stressed out," "shak-

ing . . . very upset," and "distraught."[3] Each stated in terms of certainty that nothing juror-1 had said to them, or her demeanor, would in any way affect their ability to be a fair and impartial juror.

Other than to claim that the jury might have engaged in adverse speculation about his absence from the voir dire, the defendant "offers no suggestion as to how he was prejudiced by the procedure . . ." *Commonwealth* v. *Owens*, 414 Mass. at 605. The defendant was present during the impanelment process, compare *Commonwealth* v. *White*, 37 Mass. App. Ct. 757 (1994), during which he did not exhaust his peremptory challenges. Defense counsel was an active participant in the voir dire and all his requested inquiries were put to the jurors. The best argument that can be made for the defendant on this issue, adverse speculation, is that the trial judge failed to instruct the newly constituted jury that the reason for the discharge of juror-1 was entirely personal and had nothing to do with that juror's views on the case or that juror's relationship with the other deliberating jurors.[4] See *Commonwealth* v. *Connor*, 392 Mass. 838, 845-846 (1984).

On the record before us, we conclude that the explanation put to the trial judge by juror-1 as well as the responses given by the deliberating jurors left little, if any, room for speculation as to the reason for the discharge of juror-1. In our view, the

---

[3]The defendant points to the answers of three jurors as indicative of the fact that juror-1 conveyed to the panel that she feared the defendant and his witnesses. Although we think the claim is overblown and premised upon a mischaracterization of the jurors' responses, we base our rejection of the defendant's argument upon the judge's more tactful statement:

"I didn't interpret [the responses] that way. I must say I thought that what they were saying was that she said she was in some way afraid of her decision, whatever that might be, simply because she had to — would have to continue to interact in this fairly indirect way with the various people who had been witnesses there but I certainly didn't get the impression that the other jurors were somehow taking out of that that there was something to fear here for themselves. I took it really as that she was feeling affected because, whatever her decision, she was going to see these people again."

[4]Defense counsel took no objection to the judge's failure to give a complete instruction.

required instruction (see *ibid*, citing *Commonwealth* v. *Haywood*, 377 Mass. 755, 770 n.15 [1979]), would have been no more than a statement of the obvious.

4. *Conclusion.* We conclude that, although error occurred in the defendant's trial, the error was harmless beyond a reasonable doubt. Accordingly, the defendant is not entitled to reversal of his convictions.

*Judgments affirmed.*