COMMONWEALTH *vs.* BRYANT ZIMMERMAN
(and three companion cases[1]).

Suffolk. December 2, 2003. - March 9, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Instructions to jury, Witness. *Witness,* Expert. *Evidence,* Identification.

At a criminal trial, a Superior Court judge did not abuse his discretion in dismissing a deliberating juror [149-150]; nevertheless, the judge's failure to give the jury an instruction on why that juror had been dismissed created a substantial risk of a miscarriage of justice warranting reversal of the defendants' convictions, given that the jury were left to speculate that the juror, who was a neighbor of the mother of one of the defendants, was dismissed either to protect her from feared retaliation by the defendants or because she supported the defendants [150-152]. CORDY, J., with whom IRELAND, J., joined, concurring.

A Superior Court judge did not give a criminal defendant a sufficient hearing on his request for funds to hire an expert witness, where she did not consider the desirability or necessity of the testimony to the defendant's case. [152-153] CORDY, J., with whom IRELAND, J., joined, concurring.

INDICTMENTS found and returned in the Superior Court Department on August 20, 1998.

A pretrial motion for funds was heard by *Maria I. Lopez,* J., and the cases were tried before *James D. McDaniel, Jr.,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Donna Jalbert Patalano,* Assistant District Attorney, for the Commonwealth.

*Stella Robinson* for Bryant Zimmerman.

*Richard N. Foley,* for Mario Chaparro, submitted a brief.

MARSHALL, C.J. The defendants, Mario Chaparro and Bryant Zimmerman, were indicted for armed robbery, in violation of

---

[1]Two against Mario Chaparro and one against Bryant Zimmerman.

G. L. c. 265, § 17, and assault and battery by means of a danger-
ous weapon, in violation of G. L. c. 265, § 15A, in connection
with a July 20, 1998, incident in a park in the Jamaica Plain
section of Boston. John Heaton-Jones was attacked by three
men and his bicycle was stolen. A jury convicted the two
defendants of both charges.[2]

The defendants appealed, both claiming that the judge
improperly discharged a deliberating juror without giving the
cautionary instruction mandated by *Commonwealth* v. *Connor*,
392 Mass. 838, 845-846 (1984). They also challenge statements
in the prosecutor's closing argument. Zimmerman appealed
from the denial of his pretrial motion for funds for an expert
witness on identification, and he also claims as error the judge's
handling of the jury's indication that they could not reach a
verdict. Chaparro alleges error in the judge's permitting Heaton-
Jones to testify as to his confidence in his identification, and in
the judge's instructions on identification.

The Appeals Court reversed the convictions, holding that it
was prejudicial error for the judge to dismiss a deliberating
juror and then refuse to instruct the jury in accordance with
*Commonwealth* v. *Connor*, *supra*. *Commonwealth* v. *Zimmer-
man*, 58 Mass. App. Ct. 216 (2003). As to the other issues
raised on appeal, the Appeals Court could not determine whether
the expert witness funds were properly denied, indicating that
Zimmerman could make a new motion for funds on retrial. See
*id*. at 221-222. The Appeals Court concluded there was no merit
to the claims regarding the identification testimony of Heaton-
Jones, or the judge's instructions on identification, and declined
to address the challenges to the prosecutor's closing argument
or the judge's handling of the jury's deadlock. *Id* at 222. We
granted the Commonwealth's application for further appellate
review. We now reverse the convictions and remand for retrial.

1. *Facts.* The jury could have found that, on July 20, 1998,
while riding his bicycle through a Jamaica Plain park in the late

---

[2]Chaparro also was indicted and convicted of receiving stolen property, in
violation of G. L. c. 266, § 60, and for illegal possession of ammunition, in
violation of G. L. c. 269, § 10 (*h*). The judge vacated the conviction of receiv-
ing stolen property as duplicative of the armed robbery conviction. Chaparro
pleaded guilty to the ammunition possession charge.

afternoon, Heaton-Jones was approached by three young men, Zimmerman, Chaparro, and a third man who was never identified. Zimmerman lunged at Heaton-Jones, while one of the other two men tackled him from behind, lacerating his face, and knocking him from his bicycle. Chaparro then drew a gun and struck Heaton-Jones in the mouth with it, knocking out several teeth. The men demanded that Heaton-Jones surrender his bicycle, which he did. All three men left the scene, taking the bicycle with them. Later that day Heaton-Jones identified Chaparro from a photographic array. Two days later he identified Zimmerman while driving with the police near the scene of the incident.

The trial commenced on December 7, 1999. Near the close of the first day of jury deliberations, the judge received a note from a juror, whom he referred to as "juror number 2" (juror 2), stating that "during deliberations information came out" that she had seen Chaparro two days earlier in the neighborhood where she lived. The juror's note also stated that she had recognized Chaparro's mother, who had appeared as a defense witness the previous day, as one of her neighbors. The juror wrote that she was "in no way uncomfortable sitting on the jury," because she did not personally know the defendants or their parents. The judge then conducted a voir dire of juror 2 in the presence of the defendants, their counsel, and the prosecutor, asking juror 2 about the context in which her remarks arose. The juror explained that she was "illustrating relative risk." The judge asked whether she was saying she felt at risk because Chaparro and his mother were her neighbors, and the juror responded, "No, actually I was illustrating the opposite." The judge made a few further inquiries about the context of the comments and when juror 2 first recognized Chaparro and his mother, and then suspended jury deliberations for the weekend.

On the following Monday, the prosecutor moved to dismiss juror 2, but the judge informed counsel that he would conduct an individual voir dire of the remaining members of the jury. He questioned each juror separately. The responses indicated that every member of the jury was aware that juror 2 and Chaparro's mother were neighbors. Two jurors felt that juror 2 was anxious about convicting a neighbor, although neither could

express exactly what juror 2 had said to that effect. Another juror responded that juror 2 had said, "If anyone should be afraid it should be her." A fourth juror said that juror 2 told them that "if she wanted to be sure that someone who had committed a crime was convicted for the safety of the neighborhood, that she would want that. But . . . that did not have an impact on her decision." Although each of the jurors stated that they could remain fair and impartial, two jurors were somewhat equivocal on that point.

The judge then questioned juror 2 further. Juror 2 said that she told the other jurors that her proximity to Chaparro and his mother would not influence her decision, and she had been trying to use the fact to support her position. She also said that she was less likely to be suspicious of a neighbor, but that she could remain fair and impartial. At the prosecutor's request, and over objections from defense counsel, the judge dismissed juror 2, stating that he did not feel certain that she would not give more credit to the testimony of Chaparro's mother because she was a neighbor. The judge substituted an alternate juror and instructed the new jury to begin their deliberations anew. At that time defense counsel did not request that the jurors be told that juror 2 had been discharged for reasons personal to her. Sometime after the jury were sent back to deliberate (the record does not identify the time lapse) both defense counsel asked the judge to instruct the jury that juror 2's dismissal was not related to her opinion about the trial but that her exposure to extraneous influences made her unsuitable as a juror. The judge refused to recall the jury in order to instruct them. Defense counsel objected. Two days later, the jury returned their verdicts of guilty against both defendants.

2. *Discharge of deliberating juror.* Zimmerman claims that the judge erred in removing juror 2 from the jury because the removal was not for personal reasons and there was no showing that juror 2 was unable to perform her function as a juror. Zimmerman and Chaparro both argue that the judge further erred by refusing to give the jury the instruction mandated by *Commonwealth* v. *Connor*, 392 Mass. 838, 845-846 (1984). The Commonwealth responds that the discharge was proper, and that the judge did not abuse his discretion in declining to instruct

the jury in accordance with the *Connor* case, because the reason for the dismissal was obvious.

For the reasons set forth by the Appeals Court, *Commonwealth* v. *Zimmerman*, 58 Mass. App. Ct. 216, 219 (2003), we agree that the judge did not abuse his discretion in dismissing juror 2. See *Commonwealth* v. *Tennison*, 440 Mass. 553, 555-556 (2003) (juror removed for communicating with defendant); *Commonwealth* v. *Federici*, 427 Mass. 740, 747 (1998) (determination of juror prejudice is matter within sound discretion of trial judge); *Commonwealth* v. *Kamara*, 422 Mass. 614, 616-618 (1996) (trial judge properly dismissed juror who told rest of jury that defendant was friend of her niece and member of gang); *Commonwealth* v. *Young*, 401 Mass. 390, 405-406 (1987) (juror's representations to judge as to ability to remain impartial not dispositive). As to the judge's failure to instruct the jury in accordance with *Commonwealth* v. *Connor*, *supra*, we conclude that, in the circumstances present here, the judge's failure to give the jury an instruction on why juror 2 had been dismissed created a substantial risk of a miscarriage of justice and warrants reversal.

As we noted earlier, defense counsel did not ask the judge to instruct the jury as to the reason for juror 2's discharge until sometime after the new jury had retired to deliberate, which raises the issue whether the objection was timely. Rule 24 (b) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 895 (1979), provides: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict. Upon request, reasonable time shall be given to each party to object to the charge before the jury retires." If we conclude that the objection is waived because it was untimely, we review to determine whether any error to instruct created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999). *Commonwealth* v. *Delaney*, 425 Mass. 587, 595-596 (1997), cert. denied, 522 U.S. 1058 (1998). If the objection was not waived, we review to determine whether any error to instruct created prejudicial error. *Commonwealth* v. *Deramo*, 436 Mass. 40, 49 (2002). Defense counsel should have made their request and noted their objection before the jury retired to deliberate. See

*Commonwealth* v. *Chambers*, 57 Mass. App. Ct. 47, 53 (2003). But their failure to do so is not dispositive because in this case the absence of an instruction created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Alphas, supra* at 13.

As we noted in *Commonwealth* v. *Connor, supra* at 843, "[t]he discharge of a deliberating juror is a sensitive undertaking and is fraught with potential for error." Accordingly, we said, "If a juror is discharged and an alternate substituted, the jury should be instructed not only to begin deliberations anew (see G. L. c. 234, § 26B) but also that the reason for discharge is entirely personal and has nothing to do with the discharged juror's views on the case or his relationship with his fellow jurors." *Id.* at 846. There will be occasions where the circumstances surrounding the dismissal of a deliberating juror will leave no room for speculation as to the reason for the discharge, such that the failure to give a *Connor* instruction is not error. See *Commonwealth* v. *Dosanjos*, 52 Mass. App. Ct. 531, 535-537 (2001) (members of jury aware that dismissed juror distraught and no longer wished to deliberate because she recognized defendant and witnesses). But such circumstances will be rare, and the instruction should always be given if requested.

In this case, the identification of the defendants as the assailants was hotly contested. While deliberating this crucial issue, juror 2 informed the jury that Chaparro and his mother were her neighbors. Her fellow jurors evinced different understandings of what she had said, what had motivated her disclosure, and the effect her knowledge had on her ability to decide the case. Two jurors at least assumed that juror 2 was fearful. Juror 2, however, did not express any desire to be removed, and said she could remain impartial. A judge is not required in every case to adhere to the precise language we used in *Commonwealth* v. *Connor, supra* at 846. But here the judge needed to give the jury some explanation, appropriate to the circumstances, sufficient to quell any inappropriate speculation regarding juror 2's dismissal. Cf. *Commonwealth* v. *Dosjanos, supra* at 534-537 (remaining jurors left with little, if any, room to speculate about reason for judge's discharge of juror). As the Appeals Court correctly noted, the

judge's failure to clarify to the jury the reason for the dismissal meant that the jury were left to speculate that juror 2 was dismissed either to protect her from feared retaliation by the defendants or because she supported the defendants. *Commonwealth* v. *Zimmerman, supra* at 220. By allowing the jury to speculate, the judge could have impermissibly cast a negative reflection on the defendants in the minds of the jury. See *id.*

Given the conflicting reports of her fellow jurors, it may not have been obvious to the remaining members of the jury that the dismissal of juror 2 was unrelated to her opinion on the merits of the case. *Commonwealth* v. *Connor, supra* at 846. Cf. *Commonwealth* v. *Dosjanos, supra* at 536-537. Accordingly, we reverse the convictions and remand for retrial.

3. *Remaining issues.* Before trial, Zimmerman, who is indigent, filed a motion for funds to hire an expert witness on eyewitness identification, particularly cross-racial identification, in accordance with G. L. c. 261, § 27B. After a hearing, the motion judge denied the request, concluding that the "average person would [not] incur this expense given the questionable admissibility of this type of evidence." Zimmerman did not take an interlocutory appeal under G. L. c. 261, § 27D. His right to raise the issue on appeal is not waived, however, because the motion judge did not advise Zimmerman of his right to take an interlocutory appeal, as she was required to do under G. L. c. 261, § 27D.[3],[4] See *Commonwealth* v. *Lockley,* 381 Mass. 156, 159-160 (1980).

We agree with the Appeals Court that the motion judge did not conduct a sufficient hearing on Zimmerman's request. See *Commonwealth* v. *Zimmerman, supra* at 222. See also *Commonwealth* v. *Lockley, supra* at 160-161. The admissibility of expert testimony on the capacity of eye witnesses to make identifications is within the discretion of the trial judge. *Commonwealth* v. *Hyatt,* 419 Mass. 815, 818 (1995). In determining

---

[3]The statute states in relevant part: "Upon being notified of the denial the applicant shall also be advised of his right of appeal, and he shall have seven days thereafter to file a notice of appeal . . . ." G. L. c. 261, § 27D.

[4]Because the defendant was not advised of his right of appeal under G. L. c. 261, § 27D, we need not decide whether § 27D is the exclusive means of securing appellate review of a denial of a request for costs. *Commonwealth* v. *DeWolfe,* 389 Mass. 120, 125 n.4 (1983).

whether to allow a motion under G. L. c. 261, § 27B, to hire such an expert, a judge should consider not only the potential admissibility of the expert testimony and its cost, but also the "desirability or necessity" of the testimony to the requesting party's case. *Commonwealth* v. *Lockley*, *supra* at 161. Here, as in that case, the motion judge focused her discussion with counsel solely on the amount of the expense and the questionable admissibility of the testimony. Zimmerman may renew his request prior to retrial.

Chaparro claims that the judge erred in allowing Heaton-Jones to testify as to his confidence in his identification of the two defendants.[5] He also claims the judge erred in failing to instruct the jury to consider whether the defendants fit the description of the assailants that Heaton-Jones gave to the police immediately after the incident. For the reasons stated by the Appeals Court, see *Commonwealth* v. *Zimmerman*, *supra* at 222, there were no errors.

Because a new trial is required we need not address Zimmerman's claim of error in the judge's handling of the jury's difficulty in reaching a verdict, or the defendants' claims of error in the prosecutor's closing argument.

For the reasons stated above, the judgments are reversed, the verdicts set aside, and the cases are remanded to the Superior Court for a new trial.

*So ordered.*

CORDY, J. (concurring, with whom Ireland, J., joins). I concur in the result reached by the court, but write separately to express my view on an issue that will arise on remand: the admissibility of expert testimony on the subject of cross-racial eyewitness identification.

In *Commonwealth* v. *Walker*, 421 Mass. 90 (1995), we held that a trial judge, in refusing to allow a defendant to present expert testimony concerning the unreliability of cross-racial identifications, "could reasonably have concluded in his discre-

---

[5] At trial, Heaton-Jones testified that he knew "with all [his] heart" that the defendants were the assailants.

tion that the subject of cross-racial identifications was not 'one on which the opinion of an expert would have been of assistance to the jury.' " *Id.* at 96, quoting *Commonwealth* v. *Francis*, 390 Mass. 89, 98 (1983). Our conclusion rested on citations to two principal authorities: (1) an Appeals Court decision, *Commonwealth* v. *Middleton*, 6 Mass. App. Ct. 902 (1978), which reasoned that the reliability of cross-racial identifications was not "beyond the ordinary experience and knowledge of the average juror," and (2) Massachusetts and Federal decisions stating that only "meager data" support the contention that cross-racial identifications are unreliable.[1] See *Commonwealth* v. *Charles*, 397 Mass. 1, 8 (1986); *United States* v. *Telfaire*, 469 F.2d 552, 561 (D.C. Cir. 1972) (Leventhal, J., concurring); *United States* v. *Brown*, 461 F.2d 134, 145-146 n.1 (D.C. Cir. 1971) (Bazelon, C.J., dissenting). In light of extensive scientific research in the field of behavioral psychology, both of these rationales are no longer persuasive as justifications for excluding expert testimony on cross-racial identification.

While the data supporting what social scientists call "own-race bias"[2] may have been "meager" when the *Telfaire* court first weighed in on the theory in the early 1970's, more than thirty years of research have provided an abundance of reliable data for judicial consideration. "[T]he evidence is now quite clear that people are better able to recognize faces of their own race or ethnic group than faces of another race or ethnic group." G. L. Wells, Eyewitness Testimony, 54 Ann. Rev. Psychol. 277, 280-281 (2003). This phenomenon affects the vast majority of individuals in all racial groups. See MacLin, Race, Arousal, At-

---

[1] It bears noting in passing that these two rationales — the "meager data" argument and the "average juror" theory — are in tension with one another. The "average juror" theory suggests that cross-racial identifications are so unreliable that their unreliability is common knowledge, while the "meager data" claim suggests that there is insufficient scientific evidence of unreliability to permit expert testimony.

[2] As used by witness identification experts, the term "own-race bias" does not refer to racial prejudice. Rather, own-race bias describes "the frequently observed performance deficit of one ethnic group in recognizing faces of another ethnic group compared with faces of one's own group." Sporer, The Cross-Race Effect: Beyond Recognition of Faces in the Laboratory, 7 Psychol., Pub. Pol'y & L. 170, 170 (2001). Some experts also refer to this phenomenon as "cross-race recognition deficit" and "cross-race effect." *Id.*

tention, Exposure, and Delay: An Examination of Factors Moderating Face Recognition, 7 Psychol., Pub. Pol'y & L. 134, 135 (2001); Meissner, Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review, 7 Psychol., Pub. Pol'y & L. 3, 4 (2001) (Meissner) (summarizing developments in psychology of own-race bias from 1971 through 2001).

Own-race bias has what experts call a "mirror-effect pattern": a witness is more likely to make an accurate identification of a person of her own race, but also more likely to make a misidentification of a person of another race. See Meissner, *supra* at 21. The magnitude of this misidentification is significant: a person is, according to one study, 2.2 times as likely to identify correctly a same-race suspect as a cross-racial suspect. *Id.* at 26. Moreover, the effect of own-race bias can be significant, particularly for defendant members of minority groups, because "the majority of errors for other-race faces are false alarms, that is, incorrectly identifying an other-race face," *id.*, while white witnesses are more likely to demonstrate own-race bias, particularly by offering false-alarm responses, *id.* at 21.[3]

Modern studies also persuasively undermine the contention in *Commonwealth* v. *Middleton, supra,* that the reliability of cross-racial identifications is not "beyond the ordinary experience and knowledge of the average juror." *Id.* at 902. Rather, research has shown that "laypersons often predict higher identification accuracy rates than are generally found among participants of eyewitness research" — that is, the average person thinks that eyewitness testimony generally is more accurate than it actually is. Devenport, Eyewitness Identification Evidence, 3 Psychol. Pub. Pol'y & L. 338, 347 (1997). In the more specific context of cross-racial identifications, "laypersons . . . appeared to be insensitive to . . . the impact of cross-racial identifications on

---

[3]These "false-alarm" responses are of particular concern in criminal cases, because "the erroneous identification of an individual who is not the perpetrator" is a frequent cause of wrongful conviction. Meissner, Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review, 7 Psychol., Pub. Pol'y & L. 3, 23 (2001). For example, in one study of convictions that were subsequently overturned when DNA evidence exonerated the defendants, false-alarm identifications were the "primary evidence" of guilt in eighty-five per cent of cases. *Id.* at 23-24.

eyewitness accuracy." *Id.* In sum, the unreliability of cross-racial identification *is* a subject "beyond the ordinary experience and knowledge of the average juror."

In this case, one of the defendants, an African-American, sought funds to hire an expert to testify concerning the reliability of a cross-racial identification by a white eyewitness. The defendant and the eyewitness were not previously known to each other, and the identification occurred while the witness was riding through the defendant's neighborhood in a police cruiser looking for the individuals who assaulted and robbed him two days earlier. The motion judge reasoned that the average person would not incur the expense of expert testimony, "given the questionable admissibility of this type of evidence." It is my view that such evidence should be admissible, because it is relevant, rests on a reliable basis, is sufficiently tied to the facts of this case, and is a subject on which jurors need assistance. See *Commonwealth* v. *Santoli*, 424 Mass. 837, 844 (1997) (providing standards governing admissibility of expert testimony). More broadly, it is my view that expert testimony concerning cross-racial identification should generally be admissible to challenge the reliability of a witness's identification in circumstances where the identifying witness and the person identified are strangers to each other.[4]

---

[4]Experts in the science of eyewitness identification also tend to support the use of expert testimony in trials involving cross-racial identifications. A recent survey found that ninety per cent of surveyed experts found that the phenomenon of own-race bias was "reliable enough for psychologists to present it in courtroom testimony," and seventy-two per cent would themselves testify to the existence of own-race bias. Kassin, On the "General Acceptance" of Eyewitness Testimony Research: A New Survey of Experts, 56 Am. Psychologist 405, 412 (2001).