## COMMONWEALTH vs. JAMES E. ROBINSON.

No. 11-P-1817.

Plymouth. December 5, 2012. - March 13, 2013.

Present: KAFKER, MILKEY, & AGNES, JJ.

*Resisting Arrest. Controlled Substances. Practice, Criminal,* Costs, Waiver, Instructions to jury, Motion to suppress. *Search and Seizure,* Container.

The criminal defendant did not adequately preserve for appeal a claim that a District Court judge erred in denying his motion for funds to try to identify eyewitnesses to his arrest, where the defendant did not pursue an interlocutory appeal; and where, at trial, defense counsel made no argument to the jury that State troopers' failure to take down the names of bystanders prevented the defendant from calling witnesses in his defense and did not flag the G. L. c. 261, § 27C, issues for the trial judge; further, even assuming that the defendant could be heard on the issue, no substantial risk of a miscarriage of justice arose, where the defendant eventually was given the requested funds, and the degree of prejudice from the initial denial of funds was neither self-evident nor established on the record in the case. [422-427]

At the trial of a criminal complaint charging the defendant with resisting arrest, the judge did not err in declining to instruct the jury that the defendant had the right to defend himself if the police were using excessive or unnecessary force, where the defendant could not point to any evidence upon which a reasonable jury could conclude that he had taken his actions in response to the police having used excessive or unnecessary force to effectuate his arrest. [427-428]

A District Court judge properly denied the criminal defendant's pretrial motion to suppress evidence discovered during a patfrisk, where the defendant's behavior during a stop of the vehicle in which he was a passenger, including extreme nervousness and furtive gestures when he thought State troopers could not see him, sufficed to give a reasonable trooper justification to fear that the defendant might be a threat to the trooper's safety and, thus, justified the exit order and patfrisk; further, even assuming that the defendant had not waived a claim that the troopers could not open a "fanny pack" removed from the defendant's person without first conducting a patfrisk of it for weapons, the evidence in the case supported the contention that the circumstances of the defendant's arrest deprived the trooper of the opportunity to conduct a patfrisk of the container. [428-431]

COMPLAINT received and sworn to in the Brockton Division of the District Court Department on September 17, 2007.

A pretrial motion for funds was considered by *James F.X. Dinneen*, J.; a pretrial motion to suppress evidence was heard by *David G. Nagle*, J.; and the case was tried before *Julie J. Bernard*, J.

*Merritt Schnipper* for the defendant.

*Carolyn A. Burbine*, Assistant District Attorney, for the Commonwealth.

MILKEY, J. Following a jury trial in District Court, the defendant was convicted of resisting arrest, G. L. c. 268, § 32B, and possession of a class D substance (marijuana) with intent to distribute, G. L. c. 94C, § 32C.[1] On appeal, he challenges the resisting arrest conviction based on the denial of his motion for funds to try to identify eyewitnesses to his arrest. Although the defendant was eventually granted such funds prior to trial, he argues that this did not cure the initial error. We conclude that the defendant did not preserve the issue and that he cannot demonstrate a substantial risk of a miscarriage of justice on the current record. Because we find no merit in an alternative argument that the defendant makes, we affirm his conviction of resisting arrest. With regard to the defendant's contention that the judge erred in denying his motion to suppress (the only claim he raises as to his drug conviction), the defendant waived the specific argument he now presses on appeal, and we, in any event, are unpersuaded by it. We therefore affirm that conviction as well.

1. *The defendant's request for funds.* a. *Background.* Following a traffic stop in Brockton, the State police arrested the driver of a minivan for driving with a suspended license. The defendant was seated in the rear seat of the vehicle, and there were at least two other passengers in the vehicle as well. For reasons discussed in further detail below, Trooper Brian Galvin ordered the defendant from the vehicle. In conducting a patfrisk of him, the troopers discovered a "fanny pack" stuffed down the front of the defendant's pants that contained seventeen bags

---

[1]The jury acquitted the defendant of assault and battery on a police officer and malicious damage to a motor vehicle. The judge allowed the defendant's motion for a required finding of not guilty on a disorderly conduct charge, and the Commonwealth has not appealed. A charge of simple possession of a class D substance was dismissed on the Commonwealth's own motion.

of marijuana. In the process, the defendant's pants fell to his ankles. As documented in Trooper Galvin's arrest report,[2] even before the troopers discovered the fanny pack, the defendant began a "verbal tirade" against them, "yelling at a very loud volume in the middle of the crowded neighborhood." As a result, "[a]t this time, a crowd began to form [in the] area, which only seemed to intensify [the defendant's] yelling." According to the report, the troopers then initiated the process of arresting the defendant, and this process went forward with the defendant's pants down around his ankles. At one point, the defendant spun around and kneed Galvin in the groin (the alleged act upon which the resisting arrest charge appears primarily to have been based). After the defendant was placed in a police cruiser, he shattered the vehicle's window with his feet and eventually had to be restrained with pepper spray (all the while he continued to scream at the troopers and accuse them of being racist).

A criminal complaint issued on September 17, 2007 (two days after the arrest). That same day, the defendant was determined to be indigent and counsel was appointed. Eleven days after that, the defendant filed an ex parte motion for funds "to retain an investigator to ascertain the location and availability of witnesses to the activities which are the basis of Count 1-4 of the Complaint [the counts alleging assault and battery on a police officer, resisting arrest, and the other nondrug charges]." The motion also specifically (and accurately) noted that "[t]he Incident report makes reference to these witnesses but failed to ascertain their names and addresses or otherwise identify them." On October 9, 2007, a District Court judge denied the motion through a margin annotation that reads: "Denied. Neither this motion, nor a review of the police report, supports the need for the requested funds."[3] There is no indication in this annotation or on the docket that the judge apprised the defendant of his right to pursue an interlocutory appeal.

---

[2] We focus on the arrest report, because that was the basis of the defendant's request for funds. Trooper Galvin's eventual trial testimony was essentially consistent with his report.

[3] The judge's reference to the police report indicates that the report was appended to the defendant's motion.

The trial was significantly delayed, apparently at the defendant's request (or at least acquiescence).[4] On September 10, 2010, the defendant renewed his request for funds for an investigator "to interview witnesses." A different District Court judge allowed that motion on September 17, 2010, which was over six months before the case was eventually tried (March 28, 2011). At trial, the Commonwealth relied on the testimony of the two troopers as its evidence that the defendant resisted arrest. The defendant did not present any witnesses to contest their account. Nothing properly made part of the appellate record documents the extent to which the investigator was able to uncover eyewitnesses to the arrest.[5] The jury convicted the defendant of the resisting arrest and drug charges, while acquitting him of assault and battery on a police officer and malicious damage to a motor vehicle.

b. *Discussion.* An indigent criminal defendant may request public funds to help build a defense. Such requests are governed by G. L. c. 261, §§ 27A-27G. Under the terms of G. L. c. 261, § 27C, the court "shall not deny [such a] request . . . if it finds the document, service or object is reasonably necessary to assure the applicant as effective a prosecution, defense or appeal as he would have if he were financially able to pay." G. L. c. 261, § 27C(4), as amended by St. 1980, c. 539, § 7. In *Commonwealth* v. *Lockley*, 381 Mass. 156, 160-161 (1980), the Supreme Judicial Court described this standard as follows:

> "This standard is essentially one of reasonableness, and looks to whether a defendant who was able to pay and was paying the expenses himself, would consider the 'document, service or object' sufficiently important that he would choose to obtain it in preparation for his trial. The test is not whether a particular item or service would be acquired by a defendant who had unlimited resources, nor is it whether the item might conceivably contribute some assistance to the defense or prosecution by the indigent person. On the other hand, it need not be shown that the addition of the particular item to the defense or prosecution would

---

[4]Among other apparent reasons for the delay, the defendant went through five different lawyers.

[5]An affidavit that was generated for the appeal is discussed *infra.*

necessarily change the final outcome of the case. The test is whether the item is reasonably necessary to prevent the party from being subjected to a disadvantage in preparing or presenting his case adequately, in comparison with one who could afford to pay for the preparation which the case reasonably requires."

The statute specifically requires the judge to provide a hearing before requested funds are denied, and to notify the defendant of his right to take an interlocutory appeal within seven days of any denial. G. L. c. 261, §§ 27C, 27D. In the event such an appeal is taken, the judge "shall, within three days, set forth [his] written findings and reasons justifying such denial." G. L. c. 261, § 27C(4). The record for that appeal is to consist of those findings and reasons, the defendant's affidavit and request, and "any other documents on file relevant to the appeal." G. L. c. 261, § 27D, as appearing in St. 1992, c. 133, § 563. A decision by the appropriate court reviewing the interlocutory appeal "shall be final with respect to such request." *Ibid.*

Here, the defendant did not pursue an interlocutory appeal. As a result, the requirement that the motion judge spell out his "written findings and reasons justifying [his] denial" was never triggered. Therefore, we have little basis for evaluating whether the first judge abused his discretion in denying the requested funds.[6] However, the defendant maintains that his rights were per se violated because the first judge denied the requested funding without affording him the mandatory hearing. See *Commonwealth* v. *Lockley, supra* at 161; *Commonwealth* v. *Zimmerman*, 441 Mass. 146, 152 (2004).[7] As an initial matter, we must address whether this apparent error is properly before us, and, if so, what the appropriate standard of review is.

---

[6]The fact that the second judge allowed the funding does not mean that the first judge necessarily abused his discretion.

[7]The defendant correctly notes that the cases establish that the statutory hearing requirement is to be applied strictly. Not only is "a" hearing required, but there needs to be a "sufficient" hearing, that is, one in which the judge provides defense counsel an adequate opportunity to explore "the desirability or necessity of" the sought-after evidence. *Commonwealth* v. *Lockley*, 381 Mass. at 161. See *Commonwealth* v. *Zimmerman*, 441 Mass. at 152 (hearing that did not allow relevant issues to be fully aired was not "sufficient" hearing under G. L. c. 261, § 27C). From all that appears before us, the first judge did not provide such a hearing.

As noted above, the proper route for appealing the denial of G. L. c. 261, § 27C, funding is an immediate interlocutory appeal. Having such appeals heard in this manner is critical, because it allows erroneous denials to be remedied prior to trial. This is important not only for the defendant, but also to ensure that any convictions obtained through a trial are afforded appropriate finality. However, as the Commonwealth acknowledges, where a defendant was not given the mandatory notice of his right to bring an interlocutory appeal, his failure to take such an appeal does not preclude him from raising the § 27C issue in a direct appeal of his conviction. See, e.g., *Commonwealth* v. *Zimmerman, supra,* citing *Commonwealth* v. *Lockley, supra.*[8] But the fact that a defendant in such a position may in some circumstances raise the § 27C issue in a direct appeal hardly means he can always do so. The question remains whether the defendant adequately preserved the issue for appeal. It is axiomatic that, as a general matter, a defendant has preserved an issue for a direct appeal only if he raised that issue at trial. See *Commonwealth* v. *Jackson,* 447 Mass. 603, 614 (2006); *Commonwealth* v. *Gonzalez,* 59 Mass. App. Ct. 622, 627 (2003). We see no reason not to apply that principle here.[9]

At trial, defense counsel made no argument to the jury that the troopers' failure to take down the names of the bystanders

---

[8]In *Commonwealth* v. *Lockley* itself, the court reached the defendant's G. L. c. 261, § 27C, arguments in his postconviction appeal for *two* stated reasons: he had not received notice of his interlocutory appeal rights, *and* the newly minted statute had never been the subject of an appellate opinion. 381 Mass. at 160. Moreover, in *Commonwealth* v. *Zimmerman,* the court determined that a new trial was required on other grounds; therefore, the defendant's ability to raise the § 27C issue in his direct appeal went only to whether he could press for the desired funding before the retrial that would occur in any event. 441 Mass. at 152-153. Therefore, *Zimmerman* did not squarely raise whether — decades after the availability of an interlocutory appeal has become part of the legal culture — a defendant who has not received notice of his appeal rights can knowingly sit on those rights and reserve the issue for a postconviction appeal.

[9]Nothing in *Commonwealth* v. *Lockley* or *Commonwealth* v. *Zimmerman* is to the contrary. Neither case addresses the issue of preservation, or documents the extent to which the funding issues were raised at trial. Instead, both cases frame the question as whether the court has the power to hear the claim at all outside the framework of the "professedly exclusive" interlocutory appeal procedure of G. L. c. 261, § 27D. *Commonwealth* v. *Lockley,* 381 Mass. at 159. See *Commonwealth* v. *Zimmerman,* 441 Mass. at 152 n.4.

prevented the defendant from calling witnesses in his defense, nor did he flag the G. L. c. 261, § 27C, issues for the trial judge. Thus, he provided the trial judge no opportunity to consider whether he had been deprived of an important opportunity to mount his defense, or to try to fashion a remedy for any such deprivation.[10] Under these circumstances, we conclude that the issue was not properly preserved.[11] Cf. *Commonwealth* v. *Lawson,* 46 Mass. App. Ct. 627, 631 (1999) (where defendant's motion for funds for psychiatric evaluation was preliminarily denied without prejudice and defendant "took no further action in the trial court[, he] is not now entitled to consideration of [the] matter on appeal").

Assuming the defendant can be heard to argue that the initial denial of the requested funding caused a substantial risk of a miscarriage of justice, we discern no such risk on the current record. Most salient in that analysis is the nature of the particular

[10]The defendant did not request a *Bowden* instruction, see *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980), or other instruction aimed at remedying the prejudice the defendant now claims; his written request for jury instructions instead focused on other issues. The trial transcript does indicate that the defendant orally requested a "missing witness" instruction. The judge summarily denied that request, and the defendant has not appealed that ruling. Assuming that the request for a missing witness instruction was prompted by the defendant's concerns related to the unidentified eyewitnesses (as opposed to those related to Brockton police officers who arrived on the scene during the incident), this was not explained to the trial judge. Accordingly, counsel's passing reference to such an instruction is insufficient to preserve the underlying G. L. c. 261, § 27C, issues for appeal. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979).

[11]The defendant also misreads the cases as establishing that a defendant who was denied G. L. c. 261, § 27C, funding while receiving neither a hearing nor notice of his interlocutory appeal rights is necessarily entitled to have his conviction vacated unless the Commonwealth can demonstrate that the error was harmless beyond a reasonable doubt. Rather, the case law recognizes that the appropriate remedy in such circumstances may simply be that the defendant is allowed a postjudgment hearing to assess whether the requested funding should have been granted (with a decision deferred on whether a new trial would be warranted). See *Commonwealth* v. *Bolduc,* 383 Mass. 744, 745, 748 (1981) (reserving decision on whether § 27C violation would have required new trial had one not been required on other grounds; distancing itself from implication drawn by Appeals Court that *Lockley* stood for proposition that postjudgment hearing alone necessarily would have been inadequate). See also *Commonwealth* v. *Wick,* 399 Mass. 705, 707 (1987) (remanding case for trial court judge to reconsider § 27C motions, including whether judgment should be vacated "in fairness to the defendant").

prejudice that the defendant claims. As noted, the defendant eventually was given his requested funds,[12] and the Commonwealth argues with a great deal of force that any error in the initial denial of the funds was thereby "cured."[13] The defendant counters that the problem was not cured, and could not be cured, because the passage of time made it prohibitively difficult to locate the eyewitnesses whom the troopers did not identify. Specifically, he contends that "it is reasonable to believe an investigator working two to three weeks after the incident . . . could have found people who saw and remembered it, [while] the investigator funded three years later was unable to do so." Indeed, the defendant argues that the inability to cure the problem means that the resisting arrest charge must be dismissed. See *Commonwealth* v. *Wick*, 399 Mass. 705, 707 (1987) (acknowledging possibility that delay in issuance of G. L. c. 261, § 27C, funding might cause sufficient prejudice to warrant dismissal).

The degree of prejudice that the defendant claims here is neither self-evident nor established on the current record. His specific claim about what the investigator was able to uncover is based on an affidavit that apparently was never before the trial judge and therefore is not properly part of the appellate record.[14] See Mass.R.A.P. 8(a), as amended, 378 Mass. 932 (1979). Moreover, that affidavit — which is from one of the defendant's former attorneys, not his investigator — includes only a single conclusory statement that "my investigator was unable to uncover any information concerning the identities of the people who witnessed the events leading to [the defendant's] arrest." Thus, even if we were to consider the affidavit, we would still have no information about what efforts the investigator made

---

[12]The initial request was for $1,000, while the second one — which was granted — was for $500. The defendant has made no argument based on the amount of the requested funding.

[13]Cf. *Commonwealth* v. *Stote*, 433 Mass. 19, 23 (2000), quoting from *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980) ("In measuring prejudice [of late-disclosed evidence], 'it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant to make effective use of the evidence in preparing and presenting his case' ").

[14]The caption on the affidavit indicates that it was prepared after the appeal was docketed.

and why such efforts failed. Accordingly, we lack a factual basis for determining whether earlier efforts to uncover additional eyewitnesses might have been more successful.[15] Without any development of a factual record on such issues, we are unwilling to assume that the delay in funding precluded the defendant's ability to track down additional eyewitnesses to his arrest and materially affected his ability to mount a defense. See *Commonwealth* v. *Dresser*, 71 Mass. App. Ct. 454, 458 n.10 (2008) (defendant's burden to establish existence of substantial risk of miscarriage of justice). Where, as here, a defendant is seeking to overturn his conviction based on facts that are not part of the record, such arguments are properly relegated to a new trial motion. Cf. *Commonwealth* v. *McCormick*, 48 Mass. App. Ct. 106, 107-109 (1999) (absent new trial motion accompanied by affidavits and evidentiary hearing, appellate record will often "contain[] too many gaps for us to resolve the defendant's allegations of ineffectiveness in his favor").

2. *Jury instructions.* The defendant's alternative challenge to his resisting arrest conviction requires little discussion. He argues that the judge erred by refusing to instruct the jury that he had the right to defend himself if the police were using excessive or unnecessary force. See *Commonwealth* v. *Eberle*, 81 Mass. App. Ct. 235, 239-240 (2012). However, the defendant cannot point to any trial evidence upon which a reasonable jury could conclude that the defendant took his actions in response to the police having used excessive or unnecessary force to effectuate his arrest.[16] The principal thrust of the defendant's argument appears to be that his actions were reasonable in light of the embarrassment he suffered at being arrested in public

---

[15]Notably, the arrest took place in a residential area, and the record reflects that the people who gathered in response to the defendant's screaming had come out from their homes. In addition, there were several aspects of the incident that made it potentially memorable: the screaming, the accusations of racism, the pants around the ankles, the shattering of the cruiser window, and the pepper spraying. In this context, it may not have been as difficult to identify the additional eyewitnesses as the defendant suggests. Conversely, to the extent that procuring such witnesses was difficult, it might have been similarly difficult weeks after the incident.

[16]Putting aside that the facts appear to have justified the troopers' use of the pepper spray, we note that the troopers did not use such measures until after the conduct on which the resisting arrest allegation was based.

with his pants down to his ankles. Public embarrassment is not a recognized legal defense to resisting arrest. The judge did not err in refusing to give the requested instruction.

3. *Motion to suppress.* As established by the motion judge's findings, which the defendant has not shown to be clearly erroneous, Trooper Paul Dunderdale was alone when he stopped the minivan for speeding. Once he learned that the driver's license had been suspended, he called for back-up and Trooper Galvin responded. While Dunderdale attended to the driver's arrest, Galvin stood watch over the passengers. Observing the defendant to be "extremely nervous," and to "move his arms down to his waist" and repeatedly "push[] down on his groin area," Galvin became concerned for his and Dunderdale's safety. He therefore ordered the defendant from the car and asked him if he had any weapons. The defendant acknowledged that he had a knife, which he wore on a necklace. Galvin removed the knife and conducted a patfrisk of the defendant. When Galvin approached the defendant's groin area, the defendant began his verbal tirade and kept turning his body away from Galvin to prevent the frisk from continuing. The situation rapidly escalated; in Galvin's words, "it went like from zero to a hundred immediately." Galvin was able to ascertain that there was a "hard object" inside the front of the defendant's pants, although the defendant's turning away from him prevented him from figuring out what the object was. Galvin "reached in and pulled out a fanny pack." Inside the pack, the troopers discovered seventeen tightly packed bags of marijuana.[17]

Based on these facts, the judge ruled that the exit order and patfrisk of the defendant were justified by objectively reasonable safety concerns. We agree. "[I]t does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns," *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999), and the defendant's

---

[17]The motion judge specifically found that "Galvin handed Trooper Dunderdale the fanny pack. Galvin continued the patfrisk while Dunderdale open[ed] the fanny pack to check for weapons." In fact, there was no testimony at the motion to suppress hearing about Galvin handing the pack to Dunderdale or about which trooper opened the pack. The Commonwealth has not argued that the judge's findings on this point are clearly erroneous, and our resolution of this appeal does not require us to resolve the issue.

behavior, including extreme nervousness and furtive gestures when he thought the troopers could not see him, during a motor vehicle stop where the troopers were outnumbered by the occupants of the minivan, sufficed to give a reasonable officer justification to fear that the defendant might be a threat to his safety. See *Commonwealth* v. *Torres*, 433 Mass. 669, 675 (2001). See also, e.g., *Commonwealth* v. *Stampley*, 437 Mass. 323, 327-328 (2002); *Commonwealth* v. *Charles*, 81 Mass. App. Ct. 901, 901-902, *S.C.*, 463 Mass. 1008 (2012); *Commonwealth* v. *Obiora*, ante 55, 58 (2013).

The defendant's principal argument on appeal is that even if the exit order and patfrisk were valid, once the troopers had removed the fanny pack from the defendant's person, they could not open it without first conducting a patfrisk of it for weapons. See *Commonwealth* v. *Pagan*, 440 Mass. 62, 72 (2003) ("if [a] container is such that a patfrisk [of the container] might suffice to establish that there is no potential weapon within, the container may not be opened as part of a search for weapons unless a patfrisk has first been performed").[18] However, the defendant made no such argument below, and it therefore has been waived.[19] See *Commonwealth* v. *Rivera*, 425 Mass. 633, 636-637 (1997), quoting from *Commonwealth* v. *Tyree*, 387 Mass. 191, 213 (1982), cert. denied, 459 U.S. 1175 (1983) (defendant "is not permitted to raise an issue before the trial court on a specific ground, and then to present that issue to this court on a different ground"); *Commonwealth* v. *Johnston*, 60 Mass. App. Ct. 13, 20 (2003) ("We are not obliged on appeal to address new arguments in support of . . . motions to suppress that were not argued before the trial judge"). See also Smith, Criminal Practice and Procedure § 24.8 (3d ed. 2007) ("an appellate court is not obliged to address an issue if it was not raised during the

---

[18]The court in *Commonwealth* v. *Pagan* referenced a fanny pack as a specific example of the type of container to which the rule applied. 440 Mass. at 69, citing *People* v. *Corpany*, 859 P.2d 865, 871 (Colo. 1993). Galvin testified that the fanny pack was "like a normal fanny pack" made of a "pliable" material.

[19]During the motion to suppress hearing, the defendant's cross-examination touched on the pliability of the fanny pack and what could have been felt through it. However, the defendant made no argument in either his written materials or orally that a patfrisk of the fanny pack was required before the troopers opened the pack, nor did he cite to *Commonwealth* v. *Pagan, supra.*

hearing on the motion, especially if it requires the resolution of a factual issue").

In any event, we disagree with the defendant's argument. To be sure, the defendant is correct that *Pagan* establishes a general rule that pliable containers of a certain size be pat frisked before the police open them to check for weapons. Indeed, Galvin acknowledged that he was trained to follow that norm.[20] However, Galvin also testified that the circumstances deprived him of the opportunity to do so, and the evidence supports that contention. When conducting a patfrisk of the defendant's person, Galvin knew that the defendant had been carrying one weapon and was trying to prevent the discovery of a "hard object" secreted down his pants. Thus, in addition to Galvin's background knowledge that weapons are "commonly" carried in fanny packs, the trooper had many reasons to be particularly wary of the fanny pack here. Meanwhile, the troopers faced a rapidly deteriorating situation. The defendant was actively resisting the patfrisk while screaming about racially motivated police conduct. As a result, an "extreme amount of other people" had begun to gather, and the troopers still had to attend to the remaining passengers in the minivan and the driver they had arrested. Under these specific circumstances, we believe it was reasonable to open the fanny pack without first attempting a more complete patfrisk of it.[21] In this area of law, "the overriding concern [is] the touchstone of '[r]easonableness.' " *Commonwealth* v. *Eddington*, 459 Mass. 102, 108 (2011), quoting from *Commonwealth* v. *Ellerbe*, 430 Mass. 769, 776 (2000). With this guiding principle in mind, we do not read *Commonwealth* v. *Pagan* as establishing an inviolate command requiring that containers such as fanny packs always be subjected to a full, independent patfrisk before they are opened, even if the attendant circumstances deprived the

---

[20]Specifically, he testified that "if I'd had a chance to manipulate and feel this fanny pack . . . if I had a chance to really manipulate that, like we had in training, I may have been able to, at some point under more normal circumstances, say, 'Oh, [t]hat's probably not a weapon.' " Without an extended, independent patfrisk of the fanny pack having been conducted, we do not know what specifically could have been felt during that process. Cf. *Commonwealth* v. *Cullen*, 62 Mass. App. Ct. 390, 399-402 (2004).

[21]We reach this conclusion regardless of which trooper opened the pack. See note 17, *supra*.

police of an opportunity to do so. Compare *Commonwealth* v. *Flemming*, 76 Mass. App. Ct. 632, 638 (2010) (suppression of gun found on defendant's person upheld, because where defendant was cooperative and had made no threatening movements, police had "no reason" not to conduct patfrisk of defendant before searching particular area of his person). We therefore conclude that the motion to suppress was properly denied.

*Judgments affirmed.*